


## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ROBERT BAGNELL<br>56 Columbine Circle<br>Newtown, PA 18940 | : CIVIL ACTION NO. _____ |
|  | : |
| Plaintiff, | : **JURY TRIAL DEMANDED** |
|  | : |
| v. | : |
|  | : |
| ADVANCED LIVING MANAGEMENT &<br>DEVELOPMENT, INC. d/b/a<br>ADVANCED LIVING COMMUNITIES<br>and WILLIAM BROWN<br>1290 Allentown Road<br>Lansdale, PA 19446 | : **FILED**<br>: MAY - 8 2017<br>: KATE BARKMAN, Clerk<br>: By_____ Dep. Clerk |
|  | : |
| Defendant. | : |

### COMPLAINT – CIVIL ACTION

Plaintiff Robert Bagnell ("Plaintiff"), by and through his undersigned counsel, for his

Complaint against Defendants Advanced Living Management & Development, Inc. d/b/a

Advanced Living Communities ("Defendant ALMD") and William Brown ("Defendant Brown")

(collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this action to redress violations by Defendant ALMD of the

Federal False Claims Act ("FCA"), 31 U.S.C. § 3701, *et seq.* and violations by both Defendants

of the Pennsylvania Whistleblower Law ("Whistleblower Law"), 43 P.S. § 1421, *et seq.*[1]

---

[1] Plaintiff intends to amend his Complaint to include a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* once his claims have been administratively exhausted with the Equal Employment Opportunity Commission (the "EEOC"). On May 8, 2017, Plaintiff filed a Charge of Discrimination

## PARTIES

2.  Plaintiff Robert Bagnell ("Plaintiff") is a citizen of the United States and Pennsylvania, and currently maintains a residence at 56 Columbine Circle, Newtown, PA 18940.

3.  Defendant Advanced Living Management & Development, Inc. d/b/a Advanced Living Communities is a corporation operating and existing under the laws of the Commonwealth of Pennsylvania, with a registered mailing address of 1290 Allentown Road, Lansdale, PA 19946.

4.  Upon information and belief, Defendant Brown is the President and Chief Executive Officer of ALMD with a place of employment located at 1290 Allentown Road, Lansdale, PA 19946.

5.  At all times relevant hereto, Defendants acted or failed to act through their agents, servants, and/or employees thereto existing, each of whom acted at all times relevant hereto in the course and scope of their employment with and for Defendants.

## JURISDICTION AND VENUE

6.  Paragraphs 1 through 5 are hereby incorporated by reference as though the same were fully set forth at length herein.

7.  This action is for violations by Defendant ALMD of Plaintiff's rights protected by the Federal False Claims Act ("FCA"), 31 U.S.C. § 3701, *et seq.*, and violations of Defendants of the Pennsylvania Whistleblower Law ("Whistleblower Law"), 43 P.S. § 1421, *et seq.*

8.  This Court has original jurisdiction over Plaintiff's FCA claim pursuant to 28 U.S.C. § 1331, as it is an action arising under the laws of the United States.

---

with the EEOC, dual filed with the Pennsylvania Human Relations Commission ("PHRC"). At the expiration of the 60-day waiting period, Plaintiff will file an Amended Complaint. Plaintiff's ADEA claim will allege Defendant ALMD's discrimination against Plaintiff based on his age. Filing of this Complaint prior to the expiration of the 60-day waiting period is necessary to timely preserve Plaintiff's claims under the FCA and Whistleblower Law.

9.     This Court has supplemental jurisdiction over Plaintiff's state Whistleblower Law claims pursuant to 28 U.S.C. § 1367, as Plaintiff's Whistleblower Law claims form part of the same case and controversy as Plaintiff's federal law claims.

10.    The venue in this district is proper under 28 U.S.C. § 1391(b), as the parties reside in this judicial district and the events giving rise to this action occurred in this judicial district.

## FACTS RELEVANT TO ALL CLAIMS

11.    Paragraphs 1 through 10 are hereby incorporated by reference as though the same were fully set forth at length herein.

12.    In or around 2007, Plaintiff began consulting for Defendants as an independent contractor through a third-party company.

13.    Plaintiff continued working for Defendants in a consulting capacity until Defendants hired Plaintiff into the full-time position of Chief Financial Officer ("CFO") in or around October of 2012.

14.    Defendant ALMD is a company engaged in the business of property management for properties funded in large part by the United States Department of Housing and Urban Development ("HUD"), the Pennsylvania Housing Finance Agency ("PHFA"), and the Montgomery County Office of Aging and Adult Services ("MCAAS").

15.    At all times relevant hereto, Plaintiff was an employee of Defendant AMLD and reported to Defendant Brown.

16.    At all times relevant hereto, Plaintiff performed his job well, receiving significant praise and raises for his work and no discipline.

17.    At all times relevant hereto, Plaintiff was qualified for his position with Defendant ALMD. Indeed, Defendant ALMD initially engaged Plaintiff's services as a

consultant to organize and restructure Defendant ALMD's finances. Once Plaintiff successfully accomplished this task, Defendant ALMD sought to hire Plaintiff as CFO so that Plaintiff could continue to maintain Defendant ALMD's finances.

18.     On December 13, 2016, Plaintiff was wrongfully terminated from employment with Defendants.

19.     On December 13, 2016, Defendant Brown called Plaintiff into a meeting with Randy James ("Mr. James"), one of Defendant ALMD's Board Members.

20.     At said meeting, Defendant Brown presented Plaintiff with a termination letter which stated Plaintiff was "terminated for failure to abide by company policy."

21.     When Plaintiff asked Defendant Brown for an example of his alleged failure to abide by company policy, Defendant Brown was unable to provide one.

22.     Upon information and belief, no other employees were terminated.

23.     At the time of Plaintiff's unlawful discharge, Defendant ALMD had a continuing need for the job duties and responsibilities previously performed by Plaintiff.

24.     Indeed, upon information and belief, Mr. James replaced Plaintiff as Defendant ALMD's CFO approximately three weeks after Plaintiff was terminated.

## FACTS RELEVANT TO FCA AND WHISTLEBLOWER CLAIMS

25.     Paragraphs 1 through 24 are hereby incorporated by reference as though the same were fully set forth at length herein.

26.     Throughout the duration of his employment, Plaintiff reported to Defendant Brown. In turn, Defendant Brown reported to Defendant ALMD's Board.

27.     Defendant ALMD operates as a property management company, specifically managing properties funded and/or provided by multiple federal, state, and local government

4

agencies.

28.     The properties, which receive some form of government funding from either the

United States Department of Housing and Urban Development ("HUD"), the Pennsylvania

Housing Finance Agency ("PHFA"), and/or the Montgomery County Office of Aging and Adult

Services ("MCAAS"), pay Defendant ALMD a monthly fee to manage and maintain their

buildings and grounds.

29.     Upon information and belief, the aforementioned properties funded by HUD

receive funds from the federal government on a monthly basis to subsidize residents' rent

payments.

30.     Upon information and belief, the aforementioned properties funded by PHFA and

MCAAS receive start-up funds from state and local government to build the locations and then

are financed monthly through residents' rent payments. These properties ("Tax-Credit Entities")

are typically organized as for-profit entities, however, they are not designed to actually make a

profit. Instead, upon information and belief, financial institutions operating as ninety-nine

percent (99%) partners in these properties are allowed to take a tax credit for funds expended to

manage and/or maintain said Tax-Credit Entities. Accordingly, the more money expended by the

financial institutions for the management and maintenance of these Tax-Credit Entities, the less

money those institutions pay to state and local government in taxes at year's end.

31.     Accordingly, upon information and belief, the vast majority of the money being

paid to Defendant ALMD for Defendant ALMD's services is either directly from a government

agency or directly effects taxes paid to government agencies.

32.     In turn, upon information and belief, money paid out by Defendant ALMD,

including for Defendant Brown's salary, can be directly traced back to a government agency or

Tax-Credit Entity.

33.     Indeed, upon information and belief, without the aforementioned management fees from the various properties, Defendant ALMD would be unable to continue operations.

34.     In or around 2013, not long after Defendants hired Plaintiff as CFO, Plaintiff discovered that Defendants were billing both HUD and Tax-Credit Entities for the work of Defendant ALMD's Maintenance Department. This double-billing included the wages of the maintenance crew.

35.     For example, the entire salary for one maintenance employee of approximately $36,000.00 annually was being billed to a HUD-funded entity *and* a Tax-Credit Entity for a total of $72,000.00 being billed, even though the maintenance employee was only paid $36,000.00 annually for his work.

36.     Plaintiff immediately brought this double-billing practice to Defendant Brown's attention, however, Defendant Brown indicated that he had approval to bill in this manner because it was "in the budget."

37.     Plaintiff, thinking this practice was authorized and, thus, the matter was resolved at that time, continued this practice at Defendant Brown's insistence.

38.     In or around the months of October, November, and December of 2015, PNC Bank ("PNC"), a financial institution partner of one of the Tax-Credit Entities managed by Defendants, HUD, and PHFA were in contact with Defendants, ALMD's Chief Operations Officer, Kimberly Krauter ("Ms. Krauter"), and Plaintiff regarding certain loans Defendant ALMD, through Defendant Brown, had authorized between various HUD-funded properties and Tax-Credit Entities. Indeed, on at least two occasions, the parties involved, including PNC, PHFA, Defendants, and Plaintiff, had formal meetings regarding the same.

6

39.     At that time, Plaintiff learned that certain practices of Defendant Brown were not, in fact, authorized by HUD, PHFA, MCAAS, and/or other financial partners.

40.     Indeed, both PNC and HUD classified Defendant Brown's money transfers between their respective entities as "unauthorized loans" and severely reprimanded Defendants for initiating such transfers, indicating that such transfers could not continue to occur without consequences.

41.     After learning that Defendant Brown did not have the authority he claimed to have, Plaintiff began questioning other financial practices of Defendants throughout the course of 2016.

42.     For example, in addition to the aforementioned double-billing, which continued against Plaintiff's objections, Plaintiff became aware that Defendant Brown would take his wife ("Mrs. Brown") on work-related conferences.

43.     Upon information and belief, Defendant Brown would pay for his participation in the conference, however, Defendant ALMD would reimburse Defendant Brown for the hotel room for him and his wife, as well as their food and travel expenditures for the duration of the conference.

44.     Upon information and belief, Mrs. Brown did not work for Defendants and her presence at work-related conferences was entirely unnecessary.

45.     Thus, the added expense of Mrs. Brown's presence at these conferences was an unnecessary cost to Defendant ALMD, and ultimately, to HUD and/or Tax-Credit Entities, because Mrs. Brown's presence was neither required nor disclosed.

46.     Upon information and belief, Defendant Brown would simply submit his receipts for reimbursement from Defendant ALMD, and ultimately HUD and/or tax-credit entities,

without indicating that half of the expenses he submitted were incurred by his wife.

47.     Over the course of 2016, Plaintiff spoke with Defendant Brown countless times about his unethical handling of Defendant ALMD's, and ultimately HUD and/or Tax-Credit Entities', money. Plaintiff told Defendant Brown that these actions "don't seem right," are "illegal," and that Defendant Brown should speak with Defendant ALMD's attorney about the legality of his actions.

48.     At each conversation, however, Defendant Brown repeatedly told Plaintiff to keep double-billing, transferring the money as he directed, and reimbursing him for his and his wife's expenses at conferences.

## FACTS RELEVANT ONLY TO FCA CLAIM

49.     Paragraphs 1 through 48 are hereby incorporated by reference as though the same were fully set forth at length herein.

50.     Over the course of 2016, the state of Defendant ALMD's finances plummeted. The company was in clear financial distress and Defendant Brown continued to direct that funds be shifted between federally-funded companies and Defendant ALMD in order to make monthly operating expenses.

51.     In or around October or November of 2016, Defendants held an Executive Committee Meeting. These meetings were held regularly so that Defendant Brown, Ms. Krauter, and Plaintiff could, among other things, update the Executive Committee about Defendant ALMD's finances.

52.     Upon information and belief, in the Executive Committee Meeting in or around October or November of 2016, Defendant Brown and Ms. Krauter lied to the Executive Committee about the state of Defendant ALMD's finances. For example, upon information and

belief, Defendant Brown and Ms. Krauter told the Executive Committee that Defendant ALMD's cash position was good and that the company would be able to timely pay a $500,000.00 note to the North Penn YMCA ("YMCA Note"), without issue, when, in reality, Defendant ALMD's cash position was terrible and the company would be paying approximately $3,000.00 to $6,000.00 per month in interest on the YMCA Note because Defendant ALMD did not have the funds to pay back the loan in full prior to the accrual of interest.

53.     In the Executive Committee Meeting in or around October or November of 2016, Plaintiff did not participate in providing the aforementioned false representations of Defendant ALMD's finances, and indeed, shortly after the meeting, spoke with Board Member Sharon Jones ("Ms. Jones") about the actual state of Defendant ALMD's finances, as well as all of Defendant Brown's unethical and illegal actions over the past year.

54.     Plaintiff told Ms. Jones about the double-billing, the unauthorized loans between government-funded properties, and the reimbursement of unauthorized conference expenses, among other things.

55.     Ms. Jones was visibly upset when Plaintiff related that the aforementioned activities were occurring.

56.     As a result of Plaintiff's report to Ms. Jones, at the next Board Meeting, in or around the end of November of 2016, Ms. Jones and other Board Members questioned Defendant Brown and Ms. Krauter, in detail and at length, about Defendant ALMD's finances.

57.     Defendant Brown and Ms. Krauter were visibly troubled by the Board's line of questioning, and, indeed, were unable to answer some of the questions to the Board's satisfaction.

58.     Shortly thereafter, on or about December 13, 2016, Plaintiff was terminated for

9

the aforementioned, and clearly pretextual, reasons.

59.     It is believed and therefore averred that Defendant ALMD retaliated against Plaintiff and terminated him because of Plaintiff's report to Ms. Jones of Defendant Brown's unauthorized and unethical financial transfers of and dealings with Defendant ALMD's, and ultimately government, funds, as well as Plaintiff's refusal to participate in initiating false claims against government agencies.

60.     Upon learning that Defendant Brown did not have the authority he claimed to have from HUD for certain financial practices and transfers, Plaintiff took the initiative to continue to investigate other, potentially illegal, financial activities of Defendants.

61.     Plaintiff's independent report to Ms. Jones about the true nature of Defendant ALMD's finances, which in turn caused Ms. Jones to initiate an informal internal investigation into the same, was outside the scope of Plaintiff's job description as CFO.

62.     Furthermore, Plaintiff's statements to Defendant Brown that his actions were "illegal" and that he should consult with Defendant ALMD's attorney about these questionable practices were sufficient to put Defendants on notice that litigation under the FCA was potentially imminent.

63.     Plaintiff was terminated by Defendant ALMD in retaliation for his investigation into and reports of false claims submitted to HUD in clear violation of the False Claims Act. See 31 U.S.C. § 3730(h).

## FACTS RELEVANT ONLY TO WHISTLEBLOWER LAW CLAIM

64.     Paragraphs 1 through 63 are hereby incorporated by reference as though the same were fully set forth at length herein.

65.     During his employment with Defendants, Plaintiff discovered a practice of

10

Defendant Brown and Ms. Krauter giving unilateral authorization for other employees to forge Defendant Brown's and Ms. Krauter's signatures on Defendant ALMD's checks.

66.     Upon information and belief, Defendant ALMD's checks required two authorized signatures to be valid and payable.

67.     Upon information and belief, only a select number of individuals, including Defendant Brown and Ms. Krauter but not including Plaintiff, were authorized to sign Defendant ALMD's checks. However, individuals who were not authorized to sign Defendant ALMD's checks would be asked to sign checks for Defendant Brown and/or Ms. Krauter.

68.     Indeed, on more than one occasion, Ms. Krauter would sign Defendant ALMD's checks twice—once for herself and once for Defendant Brown.

69.     Upon information and belief, the above practice was not revealed to, nor authorized by, Defendant ALMD's Board, Defendant ALMD's bank, HUD, or any Tax-Credit Entity.

70.     Plaintiff told Defendant Brown on multiple occasions that this practice was illegal and must cease. Defendant Brown, however, did not correct this practice.

71.     The Whistleblower Law defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." See 43 P.S. § 1422. As such, the aforementioned practice of allowing forged signatures on Defendant ALMD's checks constitutes wrongdoing as defined under the Whistleblower Law.

72.     Furthermore, in or around April of 2015, Defendant Brown and Ms. Krauter executed a $500,000.00 note with the North Penn YMCA ("YMCA Note") on Defendant

11

ALMD's behalf to help fund the building of North Penn Commons.

73.  Upon information and belief, Defendant Brown and Ms. Krauter sought to execute the YMCA Note so that Defendant ALMD could gain PHFA's approval on the new building.

74.  Prior to Defendant Brown and Ms. Krauter executing the YMCA Note, Plaintiff told them that Defendant ALMD would not be able to afford to pay back the loan prior to the start of interest accrual and that the execution of the YMCA Note would ultimately cost the company much more than $500,000.00.

75.  Neither Defendant Brown nor Ms. Krauter heeded Plaintiff's advice, but instead executed the YMCA Note without consideration of the impending financial ramifications or notice to the primary project investor at the time, Citizen's Bank.

76.  During the pendency of construction on North Penn Commons, Plaintiff asked Ms. Krauter multiple times to obtain invoices to confirm the work that had been completed on the project so that Defendant ALMD would have record the actual amount of the YMCA Note that had been used.

77.  Upon information and belief, Ms. Krauter never requested such invoices.

78.  In or around August of 2015, interest began to accrue on the YMCA Note and, as Plaintiff stated prior to April of 2015, Defendant ALMD was unable to pay back the loan in full.

79.  As a result, Defendant ALMD began to incur approximately $3,000.00 to $6,000.00 per month in interest payments on a loan which Defendants could not verify had been used in its entirety.

80.  Upon information and belief, the YMCA Note remains outstanding and Defendant ALMD continues to pay monthly interest on the same, using money illicitly

12

transferred from HUD and/or Tax-Credit Entities to make the payments.

81.    The Whistleblower Law defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources" derived from public sources. See 43 P.S. § 1422. As such, Defendants' actions regarding the YMCA Note constitute waste under the Whistleblower Law.

82.    Furthermore, upon becoming aware in or around the end of 2015 that Defendant Brown did not actually have the authority for the aforementioned double-billing of Maintenance Department salaries, Plaintiff told Defendant Brown that this practice was illegal and must cease. However, Defendant Brown continued to insist that the salaries were "in the budget" and he could therefore continue the practice of double-billing.

83.    The Whistleblower Law defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." See 43 P.S. § 1422. As such, the aforementioned unauthorized practice of double-billing certain salaries to separate entities constitutes wrongdoing as defined under the Whistleblower Law.

84.    Plaintiff also explained to Defendant Brown, on multiple occasions, that his unauthorized loans between federally-funded and Tax-Credit Entities was illegal and must cease. Defendant Brown, however, never corrected this practice.

85.    The Whistleblower Law defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." See 43 P.S. § 1422. As such, the aforementioned practice

13

of Defendant Brown's unauthorized loans constitutes wrongdoing as defined under the
Whistleblower Law.

86.     Plaintiff further told Defendant Brown numerous times that Defendant ALMD's
reimbursement of Defendant Brown for Mrs. Brown's presence and expenses at work-related
conferences was wrong and should not continue. Unfortunately, Defendant Brown continued to
request these unauthorized and unnecessary reimbursements.

87.     The Whistleblower Law defines "waste" as "[a]n employer's conduct or
omissions which result in substantial abuse, misuse, destruction or loss of funds or resources"
derived from public sources. See 43 P.S. § 1422. As such, Defendant Brown's request that
Defendant ALMD reimburse him for his wife's expenditures for travel, lodging, and meals at
work-related conferences constitutes waste under the Whistleblower Law.

88.     Not only did Plaintiff repeatedly report the aforementioned waste and wrongdoing
to Defendant Brown, he also reported the same to Ms. Jones, one of Defendant ALMD's Board
Members, in or around November of 2016—just weeks prior to his wrongful termination.

89.     Accordingly, Defendants were on notice of Plaintiff's report to his employer
and/or reasonably aware of the potential of Plaintiff's imminent report to the proper authorities
of the aforementioned waste and wrongdoing.

90.     On or about December 6, 2016, Plaintiff reported to Defendant Brown that
Defendant ALMD's operating account would again be short. Specifically, Defendant ALMD's
operating account was going to be short approximately $38,000.00.

91.     Defendant Brown stated that he had just received a check from a Board Member
Ken Clemens ("Mr. Clemens") for $40,000.00 and that this check could be deposited into
Defendant ALMD's operating account to make payroll for the month.

14

92.     When Plaintiff questioned the intended use for the $40,000.00, Defendant Brown indicated it was supposed to be used to replace windows on one of the Tax-Credit Entities' buildings, which was managed by Defendants.

93.     Upon learning that the $40,000.00 would be yet another unauthorized use of money, Plaintiff refused to deposit the check, indicating that it was wrong to use the money for payroll when it was intended to replace windows on a Tax-Credit Entity property.

94.     Just seven (7) days later, on or about December 13, 2016, Plaintiff was terminated for clearly pretextual reasons.

95.     Upon information and belief, Defendants wrongfully discharged Plaintiff for reporting to his employer, and/or believing Plaintiff was about to report to an appropriate authority, waste and wrongdoing in violation of public policy.

96.     The Commonwealth of Pennsylvania has a clear and important interest and policy in preventing the waste of public funds, as indicated by, among other things, the restrictions imposed by 43 P.S. § 1423.

97.     As such, the termination of an employee for reporting employer waste of public funds is contrary to the public policy of Pennsylvania.

98.     The Commonwealth of Pennsylvania also has a clear and important interest and policy in preventing wrongdoing within a publicly-funded entity, as indicated by, among other things, the restrictions imposed by 43 P.S. § 1423.

99.     As such, the termination of an employee for reporting the practices of forged signatures, ill-advised and unnecessary accrual of interest, double-billing for certain salaries, unauthorized loans between government-funded entities, and reimbursement of unauthorized conference expenses is contrary to the public policy of Pennsylvania.

15

100.    As a result of Defendants' deliberate, willful, malicious, and unlawful actions, Plaintiff has suffered damages, including but not limited to, loss of employment, promotion benefits, earnings and earnings potential, and other economic damages, and has also suffered mental anguish, emotional pain and suffering, emotional distress, humiliation, and damage to reputation.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3701, *et seq.*
## RETALIATION

101.    Paragraphs 1 through 100 are hereby incorporated by reference as though the same were fully set forth at length herein.

102.    The FCA seeks, among other things, to stop "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." See 31 U.S.C. § 3729(a)(1)(A).

103.    Furthermore, the FCA states that "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of" the FCA. See 31 U.S.C. § 3730(h)(1).

104.    As such, Plaintiff engaged in activity protected under the FCA when he reported Defendant Brown's unauthorized financial activity, specifically the double-billing, unauthorized loans, and/or reimbursement of unauthorized conference expenses, to Ms. Jones, one of Defendant ALMD's Board Members, as this report was outside the scope of his regular job duties in reporting to Defendant Brown.

16

105.    As a result of Plaintiff's protected activity, Ms. Jones initiated an informal internal investigation into Defendant ALMD's finances, putting Defendants on notice that litigation under the FCA was likely imminent.

106.    Additionally, Plaintiff informed Defendant Brown that his practices of double billing, unauthorized loans, and reimbursement for unauthorized conference expenses were "illegal," which also put Defendants on notice that litigation under the FCA was likely imminent.

107.    Plaintiff was terminated on December 13, 2016—shortly after his report to Ms. Jones and the subsequent revelation to Defendant Brown and/or Ms. Krauter, at the Board Meeting in or around the end of November, of Ms. Jones' informal internal investigation.

108.    Defendant ALMD's alleged reasons for terminating Plaintiff were clearly pretextual. It is believed and therefore averred that Plaintiff was terminated in retaliation for his exercise of protected activity under the FCA, of which Defendant ALMD was certainly aware.

109.    As a result of Defendant ALMD's deliberate, unlawful, and malicious actions as set forth above, Plaintiff has suffered loss of employment, promotion benefits, earnings and earnings potential, and loss of other significant economic benefits.

**WHEREFORE**, as a result of the unlawful conduct of the Defendant ALMD, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant ALMD, and grant him the maximum relief allowed by law, including, but not limited to:

(A)    Back wages and front pay in an amount to be determined at trial, but no less that One Hundred and Fifty Thousand Dollars ($150,000.00);

(B)    Liquidated damages;

(C)    Plaintiff's reasonable attorneys' fees and all costs of this action;

(D)    Pre-judgment interest in an appropriate amount;

(E)     Such other and further relief as is just and equitable under the circumstances; and

(F)     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the

financial recovery available to Plaintiff in light of the caps on certain damages set forth by

applicable federal law.

**COUNT II**
**PENNSYLVANIA WHISTLEBLOWER LAW**
**43 P.S. § 1421, *et seq.***
**VIOLATION**

110.    Paragraphs 1 through 109 are hereby incorporated by reference as though the

same were fully set forth at length herein.

111.    The aforementioned actions of Defendants constitute a violation of the

Pennsylvania Whistleblower Law ("Whistleblower Law"), 43 P.S. § 1421, *et seq.*, entitling

Plaintiff to all appropriate damages and remedies available.

112.    Defendant ALMD is an "employer" under the Whistleblower Law because it

receives Commonwealth funding to manage housing units funded in part by federal, state, and

local monies, and, as such, is a business that receives public contracts or funding from the

Commonwealth or its subdivisions.

113.    Defendant Brown is an "employer" under the Whistleblower Law because he is

an individual receiving Commonwealth funding, in the form of wages from Defendant ALMD,

which receives money for services provided to federally-funded properties and Tax-Credit

Entities.

**WHEREFORE**, as a result of the unlawful conduct of the Defendants, Plaintiff

respectfully requests that this Court enter judgment in his favor and against Defendants, and

grant him the maximum relief allowed by law, including, but not limited to:

(A)     Back wages and front pay in an amount to be determined at trial, but no less that

18

One Hundred and Fifty Thousand Dollars ($150,000.00);

(B)     Compensatory damages and lost benefits;

(C)     Plaintiff's reasonable attorneys' fees and all costs of this action;

(D)     Pre-judgment interest in an appropriate amount;

(E)     Such other and further relief as is just and equitable under the circumstances; and

(F)     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the

financial recovery available to Plaintiff in light of the caps on certain damages set forth by

applicable federal law.

## COUNT III
## PENNSYLVANIA WHISTLEBLOWER LAW
## 43 P.S. § 1421, *et seq.*
## WRONGFUL TERMINATION

114.    Paragraphs 1 through 113 are hereby incorporated by reference as though the

same were fully set forth at length herein.

115.    Throughout the course of his employment, Plaintiff discovered that Defendant

Brown and/or Ms. Krauter were allowing unauthorized individuals to sign Defendant ALMD's

checks on their behalf.

116.    Plaintiff complained to Defendant Brown that this activity was unlawful and

further disclosed the same to Defendant ALMD through Ms. Jones.

117.    Throughout the course of his employment, Plaintiff also advised against executing

the YMCA Note, as it would cause Defendant AMLD to incur a debt it could not pay prior to the

accrual of substantial interest.

118.    Plaintiff complained to Defendant Brown that this activity was wasteful and

further disclosed the same to Defendant ALMD through Ms. Jones.

119.    Throughout the course of his employment, Plaintiff also discovered Defendants

19

were double-billing certain wages to tax-credit entities.

120.   Plaintiff complained to Defendant Brown that this activity was unlawful and further disclosed the same to Defendant ALMD through Ms. Jones.

121.   Throughout the course of his employment with Defendants, Plaintiff identified numerous unauthorized loans of Tax-Credit Entities' funds being initiated by Defendant Brown between companies under Defendant ALMD's control.

122.   Plaintiff complained to Defendant Brown that this activity was unlawful and further disclosed the same to Defendant ALMD through Ms. Jones.

123.   Throughout the course of his employment with Defendants, Plaintiff identified numerous requests from Defendant Brown for reimbursements of unauthorized conference expenses.

124.   Plaintiff complained to Defendant Brown that this activity was wasteful and further disclosed the same to Defendant ALMD through Ms. Jones.

125.   Mere weeks after Plaintiff's report to Defendant ALMD, through Ms. Jones, of Defendant Brown and/or Ms. Krauter's waste and/or wrongdoing, Plaintiff was terminated for clearly pretextual reasons.

126.   It is believed and therefore averred that Plaintiff was wrongfully discharged for reporting waste and wrongdoing to Defendants and/or based on Defendants' belief that Plaintiff was about to report the same to appropriate authorities.

127.   Defendants unlawfully violated the public policy exception to Pennsylvania's common law tradition of at-will employment by unlawfully and retaliatorily terminating Plaintiff's employment because of Plaintiff's knowledge and disclosure of unlawful waste and/or wrongdoing in violation of 43 P.S. § 1423.

128.    The actions of Defendants, as stated above, constitutes a violation of

Pennsylvania public policy entitling Plaintiff to all appropriate damages and remedies available.

**WHEREFORE**, as a result of the unlawful conduct of Defendants, Plaintiff respectfully

request that this Court enter judgment in his favor and against Defendants, and grant him the

maximum relief allowed by law, including, but not limited to:

(A)    Back wages and front pay in an amount to be determined at trial, but no less than

One Hundred and Fifty Thousand Dollars ($150,000.00);

(B)    Compensatory damages and lost benefits;

(C)    Punitive damages for Defendant's retaliatory practices which were committed

with malicious and reckless indifference to Plaintiff's rights;

(D)    Pre-judgment interest in an appropriate amount;

(E)    Such other and further relief as is just and equitable under the circumstances; and

(F)    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the

financial recovery available to Plaintiff in light of the caps on certain damages set forth by

applicable federal law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**MURPHY LAW GROUP, LLC**

By:_____

Michael Murphy, Esquire
Eight Penn Center, Suite 2000
1628 John F. Kennedy Blvd
Philadelphia, PA 19103
TEL: 267-273-1054
FAX: 215-525-0210
murphy@phillyemploymentlawyer.com
Attorney for Plaintiff

Dated: May 8, 2017

## DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to his potential claims and his claims to damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.